UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT OWENSBORO
CIVIL ACTION NO. 4:24-CV-00062-JHM

**YEHOSHUA ISRAEL MILLAY**                                                                                       **PLAINTIFF**

**v.**

**DAVIESS COUNTY**                                                                                                       **DEFENDANT**

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on the cross-motions for summary judgment filed by Defendant Daviess County and Plaintiff Yehoshua Israel Millay. (DN 53 and DN 55). Defendant has filed a response to Plaintiff's motion. (DN 57). For the following reasons, Defendant's motion will be granted, and Plaintiff's motion will be denied.

**I**.

Plaintiff was a pretrial detainee at the Daviess County Detention Center (DCDC) at the time pertinent to this action. Proceeding *pro se*, Plaintiff filed a 42 U.S.C. § 1983 complaint alleging that in November 2023 he developed an infection on his head and neck after he used a pair of "contaminated communal hair clippers" distributed by DCDC staff. (DN 6, PageID.13). Plaintiff alleges that he began experiencing cold chills and pain in his throat and chest and that he alerted both a correctional officer and nurse that he had an infection the "size of a lemon" on his throat. He states that the jail's nurse "failed to take my concerns seriously," that he began to experience labored breathing, and that his condition worsened. Plaintiff reported to a sick call on November 18, 2023, however "no attention was given until 11/19/23." (*Id.*).

Plaintiff alleges that on November 19, 2023, he requested "DCDC Supervisor intervention" for his infection and was returned to sick call. "During this time DCDC medical staff finally agreed to transport me to [the hospital]." (*Id.*, PageID.13-14). He states that the emergency room

physician told him that he had a life-threatening condition requiring immediate surgery and a "broad spectrum of antibiotics." (*Id.*, PageID.14). Plaintiff alleges that "cultures reflected the DCDC communal hair clippers inflicted me with [Methicillin-resistant Staphylococcus aureus (MRSA)]." (*Id.*). He asserts that DCDC's "distribution of communal hair clippers without further guidance, oversight, and adequate means of sterilization" caused him to develop a serious infection resulting in "a facial scar and other permanent damages." (*Id.*).

Upon initial review pursuant to 28 U.S.C. § 1915A, the Court allowed Plaintiff's Fourteenth Amendment claim to proceed against Defendant Daviess County for deliberate indifference to his health/safety on a theory of municipal liability only. (DN 14 and DN 17).

## II.

### A.

Defendant now moves for summary judgment on grounds that: (1) Plaintiff's Fourteenth Amendment deliberate indifference claim fails as a matter of law; (2) Plaintiff fails to establish a policy or custom attributable to Defendant that caused Plaintiff's constitutional rights to be violated; (3) there is no genuine issue of material fact that Defendant caused Plaintiff's bacterial infection; and (4) Plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act. (DN 53, PageID.489-97).

In support of its motion, Defendant submits the following evidence: Plaintiff's deposition testimony;[1] Plaintiff's grievance history and incident reports from DCDC; Defendant's answers to interrogatories; Plaintiff's medical records; background information on MRSA; photographs of Plaintiff; the DCDC Inmate Handbook; and the sworn affidavits of Nicki Fentress, R.N. at

---

[1] Plaintiff's deposition is reproduced in full at DN 58.

Southern Health Partners,[2] and Shannon Coomes, Captain of Administration at DCDC. (DN 53-1, PageID.498 through DN 53-20, PageID.559).

**B.**

Plaintiff was ordered by the Court to file a response to Defendant's summary judgment motion. (DN 54). In lieu thereof, Plaintiff filed a "motion for summary judgment or partial summary judgment" in which he asserts that DCDC's policy of providing improperly sanitized communal hair clippers to inmates caused him to contract a MRSA infection in violation of his Fourteenth Amendment rights.[3] (DN 55, PageID.583, 592-93, 595). In support of his motion, Plaintiff submits: Defendant's answers to interrogatories; a photograph and e-mail pertaining to QS Plus+ Instant Hand Sanitizer; excerpt from Title 501, Chapter 003, Regulation 080 of the Kentucky Administrative Regulations (KAR); medical records; Incident Report dated November 19, 2023; and grievances from DCDC dated May 22 and May 25, 2025. (DN 55-1, PageID.598 through DN 55-20, PageID.644).

**C.**

Defendant responded to Plaintiff's motion incorporating its previous motion for summary judgment (DN 55) with supporting exhibits. (DN 57 through DN 57-20).

**III.**

Before the Court may grant a motion for summary judgment, it must find that there is "no genuine dispute as to any material fact" and that the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a

---

[2] Southern Health Partners is an entity contracted with the county to provide medical care for inmates at the DCDC and is not a party to this action.
[3] While Plaintiff references the Eighth Amendment in his submissions, the Court analyzes his conditions of confinement claim under the Fourteenth Amendment, as discussed in further detail below.

genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party satisfies this burden, the non-moving party must produce specific facts demonstrating a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

Assuming the moving party satisfies its burden of production, the nonmovant "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Celotex*, 477 U.S. at 324). The non-moving party's evidence is to be believed, *Anderson*, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the Court must be drawn in favor of the party opposing summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The fact that a plaintiff is *pro se* does not lessen his or her obligations under Rule 56. "The liberal treatment of pro se pleadings does not require lenient treatment of substantive law . . . and the liberal standards that apply at the pleading stage do not apply after a case has progressed to the summary judgment stage." *Johnson v. Stewart*, No. 08-1521, 2010 WL 8738105, at *3 (6th Cir. May 5, 2010) (citations omitted).

## IV.

### A.

The facts are undisputed except where noted, and are drawn from the parties' submissions, including the exhibits attached to their summary judgment motions.

#### 1.

MRSA, or Methicillin-resistant Staphylococcus aureus, is a type of staph bacteria that is widespread in the general community. It is commonly found where people are housed in close

quarters, such as nursing homes, hospitals, and jails/prisons. MRSA bacteria can live on a surface for weeks or months and can be carried by an individual without showing signs of infection. It is transmitted through direct skin contact or indirectly through shared items. Infection can occur when the pathogen gets into the body, usually through small nicks in the skin. Handwashing with soap and water or using an alcohol-based hand rub serve to prevent the spread of MRSA by reducing bacterial counts. (DN 53-15 through 53-18).

**2.**

On September 27, 2023, during meal pass, a deputy observed Plaintiff with dark circles, bruising, and scratches around his eyes and on his face, along with blood on his uniform. Due to signs of an altercation, the deputy advised Plaintiff to leave his cell and speak with a lieutenant. (DN 53-1). Plaintiff testified during his deposition that he was assaulted by some other inmates, which caused scratches to his eyes and face and "two black eyes." (DN 58, PageID.759).

Sometime between September 27, 2023, and November 2, 2023, Plaintiff hit his shin on his bunk, causing an open sore. He sought antibiotic cream due to the sore possibly being infected. (*Id.*, PageID.759-760).

On November 18, 2023, Plaintiff submitted an Inmate Medical Request stating, "It seems I may have a staff infection in my neck. There is a lot of swelling, discharge and pain. I have no means to treat whatever the issue is. Thank you." (DN 53-4). Plaintiff submitted another medical request the following day stating, "MRSA, neck + jaw swelling. Effecting neck mobility." (*Id.*). Chart notes by jail medical staff reveal that Plaintiff was seen on November 19, 2023, at 1:52 p.m.:

> Pt. comes to medical for sick call with c/o of "staff infection on my neck" Upon exam pt has swollen firm knot to left chin/neck area. No drainage noted at this time. Does have white center. Before I

> could clean the area pt started to squeeze and had small amount purulent drainage noted. Bactrim & Bactrim started as per protocol.

(DN 53-5). Plaintiff was returned to his cell after the sick call.

Later that evening at 9:05 p.m., Plaintiff notified a deputy that the mass on his neck was leaking fluid, causing pain, and making it difficult to breathe. He was sent back to the medical department at 9:50 p.m., where he was examined by a nurse, who then contacted the doctor for further orders. A short time after Plaintiff was returned to his cell the second time, medical staff determined to send Plaintiff to the hospital for further evaluation. (DN 53-8; DN 53-9; DN 58, PageID.765-767).

Plaintiff was admitted to the Owensboro Health Regional Hospital (OHRH) Emergency Department on November 19, 2023, at 10:04 p.m. (DN 53-11; DN 55-14). OHRH hospital records indicate that Plaintiff presented with swelling and pain below his left chin. He reported the following to hospital staff:

> 3 days ago he was using the communal clippers. He shaved his head as well as his beard. 1 day later he noted several small ulcers on the top of his scalp and one on the left side of his chin. While the scalp ulcers have been slow to heal they did not progress. The one on his chin however continued to increase in size along with swelling and pain.

(DN 53-13).

Plaintiff indicated "that he was in contact with several people in jail, who presently have staph infections." (DN 53-12). He also reported "other skin wounds . . . specifically his left shin" due to an "incident in jail that resulted in the ulcers." (DN 53-13). These wounds were initially draining and also slow to heal. (*Id.*).

In the early morning hours of November 20, 2023, Plaintiff was transferred to a surgical care unit at OHRH for "submental abscess" and "cellulitis and abscess of neck" requiring incision,

6

drainage, and irrigation of the submental abscess. (DN 53-11 through 53-13; DN 55-15). Laboratory cultures taken from Plaintiff's neck revealed "2+ STAPHYLOCOCCUS AUREUS * * * NOTE MRSA * * ESTABLISH CONTACT ISOLATION." (DN 55-17). Plaintiff was discharged from the hospital on November 22, 2023. (DN 55-13).

**3.**

During his deposition, Plaintiff testified that he had used the jail's communal hair clippers approximately two to three days before he noticed the symptoms on his neck, but did not know how long it was between noticing the issue on his neck and submitting his first medical request at the jail on November 18, 2023. (DN 58, PageID.763). Plaintiff testified that he believes his infection was caused by using the clippers: "what I understand and what I'm sure of is that I contracted MRSA infections on - - in the same places I had just used the clippers." (*Id.*, PageID.762). Plaintiff acknowledged, however, that he could have shared a cell with another inmate that either carried or had an active MRSA infection, and that it was also possible that he nicked himself with the clippers. (*Id.*, PageID.761-62). Plaintiff testified that he did not have a physician or expert opinion as to whether he contracted MRSA from the jail's clippers. (*Id.*, PageID.762).

With respect to the jail's sanitation procedures, DCDC Jailer Arthur F. Maglinger explained, in his responses to Plaintiff's interrogatories, that inmate clippers and attachments are cleaned and sprayed with Clippercide, a registered bactericide, fungicide, and virucide, prior to dispensing the clippers on Mondays and Thursdays, and are again cleaned at the end of the day. (DN 53-6). Plaintiff testified that he does not dispute that the clippers are sprayed with Clippercide before and after they are distributed to inmates. (DN 58, PageID.760, 770).

Additionally, Maglinger stated that the jail provides Aero Care QS Plus Instant Hand Sanitizer to inmates, which kills 99.99% of most common germs and is effective against MRSA, to squirt on the clippers and attachments. (DN 53-6). Plaintiff testified that Defendant gives inmates instant foaming hand sanitizer to spray on the clippers, and that Plaintiff did so before using them, *see* DN 58, PageID.760, but disputes the effectiveness of the QS Plus sanitizer for use on clippers. (DN 55, PageID.593-95; DN 55-5).

**B.**

**1.**

The "Fourteenth Amendment applies to conditions-of-confinement claims brought by pretrial detainees" such as Plaintiff. *Bensfield v. Murray*, No. 4:21-CV-P104-JHM, 2022 WL 508902, at *2 (W.D. Ky. Feb. 18, 2022) (citing *Brawner v. Scott Cnty.*, 14 F.4th 585, 591 (6th Cir. 2021)). This test resembles the analysis for deliberate indifference to a serious medical need and consists of two prongs. *Elswick v. Derrough*, No. 3:23-CV-00033-GNS-CHL, 2025 WL 1651927, at *10 (W.D. Ky. June 10, 2025), *aff'd*, No. 25-5632, 2026 WL 166407 (6th Cir. Jan. 21, 2026). To satisfy the first, or objective prong, Plaintiff must show "that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Contemporary standards of decency determine whether conditions of confinement meet this standard. *See, e.g.*, *Hadix v. Johnson*, 367 F.3d 513, 525 (6th Cir. 2004) (citing *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)). Contemporary standards of decency are violated only by "extreme deprivations" which deprive the prisoner of the "minimal civilized measure of life's necessities." *Id*. (citing *Hudson v. McMillian*, 503 U.S. 1, 9, (1992)).

To satisfy the second prong under the Fourteenth Amendment, Plaintiff must show that Defendant acted "deliberately" and "recklessly 'in the face of an unjustifiably high risk of harm

8

that is either known or so obvious that it should be known.'" *Brawner*, 14 F.4th at 596 (quoting *Farmer*, 511 U.S. at 836). Stated another way, "[a] pretrial detainee must prove 'more than negligence but less than subjective intent—something akin to reckless disregard.'" *Id.* at 596–97 (quoting *Castro v. Cnty. of Los Angeles,* 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc)).[4]

**2.**

Under § 1983, a municipality or county can be held liable only if the plaintiff demonstrates that the injury suffered was a direct result of an official policy or custom. *See Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). "[A] municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.*; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). To demonstrate municipal liability, a plaintiff "must (1) identify the municipal policy or custom, (2) connect the policy to the municipality, and (3) show that his particular injury was incurred due to execution of that policy." *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003).

"An underlying constitutional violation is the *sine qua non* of municipal liability . . . ." *Puskas v. Delaware Cnty.*, 56 F.4th 1088, 1099 (6th Cir. 2023); *see also Thomas v. City of Columbus*, 854 F.3d 361, 367 (6th Cir. 2017) ("No constitutional violation means no municipal liability."), *abrogated on other grounds as recognized in Romero v. City of Lansing, Mich.*, 159 F.4th 1002, 1009 (6th Cir. 2025); *see also North v. Cuyahoga Cnty.*, 754 F. App'x 380, 389 (6th Cir. 2018) ("There must be a constitutional violation for a § 1983 claim against a municipality to succeed—if the plaintiff has suffered no constitutional injury, his *Monell* claim fails.").

---

[4] "Although the subjective prong of a Fourteenth Amendment pretrial detainee's conditions of confinement claim might differ from the subjective prong of the Eighth Amendment claim, the objective prong is the same under either amendment." *Lyons v. Barry Cnty. Jail*, No. 1:24-CV-1162, 2025 WL 262142, at *6 (W.D. Mich. Jan. 22, 2025) (citing *Batton v. Sandusky Cnty.*, No. 23-3168, 2024 WL 1480522, at *3 (6th Cir. Apr. 5, 2024)). The Court therefore cites to cases applying the Eighth Amendment standard where they are instructive to the objective component analysis.

**C.**

Turning to the parties' arguments, Defendant contends that the evidence establishes that DCDC did not have a custom, policy, or practice of distributing unsterilized clippers and that there is no evidence of a causal link between the alleged policy and Plaintiff's MRSA infection. (DN 53, PageID.493-95).

Defendant cites to its Answers to Interrogatories dated December 18, 2024. Therein, Jailer Maglinger states that DCDC is regulated by the Kentucky Department of Corrections and the Kentucky Jail Standards at KAR 7:080 (11), which provides that, "Hair cutting services or sanitized hair cutting equipment shall be available to all prisoners." (*Id.*, PageID.494). With respect to the sanitation procedures of hair cutting equipment:

> Daviess County Detention Center provides Aero Care QS Plus+ Instant Hand Sanitizer to inmates to squirt on the clippers and attachments . . . . [which] kills 99.99% of most common germs and is effective against MRSA. Further, the Jail staff uses Clippercide Spray for Hair Clippers to clean and sanitize the equipment . . . . Clippercide spray . . . is a registered bactericide, fungicide, and virucide.
> . . .
> Pursuant to the Inmate Handbook, #17, "Hair and nail clippers, along with sanitizing solution, will be offered to general population inmates on Mondays and Thursdays on first shift." The clippers are provided to each cell in a container that includes the electric clippers, attachments and cleaning solution. Inmates are expected to squirt the clippers and attachments with the Aero Care QS Plus cleaning solution after each use. In addition, the container, clippers, and attachments are cleaned and sprayed with Clippercide spray prior to dispensing the clippers on Mondays and Thursdays and are cleaned again at the end of the day.

(DN 53-6).

Defendant also cites to Plaintiff's deposition testimony, in which Plaintiff stated that he did not have an expert opinion to support his conclusion that his MRSA infection was contracted from the clipper usage and admitted that it was possible that he had nicked himself with the clippers

or shared a cell with another inmate who either carried or was infected with MRSA. (DN 58, PageID.762). Plaintiff testified, "what I'm sure of is that I contracted MRSA infections on - - in the same places I had just used the clippers." (*Id*.).

Plaintiff, on the other hand, maintains that he contracted MRSA while using the communal clippers due to the Jail's policy of inadequate sanitizing procedures. Specifically, he argues that the QS Plus hand sanitizer distributed with the communal clippers was ineffective against MRSA, causing him to contract an infection:

> At DCDC the communal hair clippers are issued to the population twice a week . . . . [T]hey are issued in a box with clipper attachments, nail clippers and a bottle of Mild Aerocare QS Plus Instant Foaming Hand Sanitizer. While no instructions are offered in any form "Inmates are expected" to squirt the instant foaming hand sanitizer on the clippers before or after every use as the method to sanitize the communal hair clippers. However, Aerocare QS Plus . . . is not designed for this purpose.

(DN 55, PageID.583). He goes on to explain that,

> Defendant willfully misused Aerocare QS Plus Instant Foaming hand sanitizer against product design and instruction as it's method to sanitize the communal hair clippers . . . . It is clear that using Instant Foaming Hand Sanitizer on the communal hair clippers was an inappropriate and ineffective method . . . . And, it is also most certainly the cause of the MRSA infection in this case.

(*Id*., PageID.592-95). To support this contention, Plaintiff produces an email from a customer service representative of ABC Compounding, presumably the manufacturer of the QS Plus sanitizer, who wrote that "QS Plus is NOT APPROVED for the use [of] clippers. It is used for handwashing to decrease bacteria on the skin." (DN 55-5).

Plaintiff further avers that DCDC later implemented the distribution of Clippercide to inmates on or about May 22, 2025, "following a Department of Corrections inspection and also after the Plaintiff reached out to various agencies . . . ." (DN 55, PageID.593). He cites to his May

11

25, 2025, grievance regarding the jail's recent policy providing Clippercide for inmate use, which reads, "There is a new bottle of germicide with the clippers. I didn't see the broadcast about what this is or instructions. Can we get a copy please." (DN 55-19). The grievance response states,

> Cleaning Procedure Within Housing Unit/Cell[.] The clipper container will include a full spray bottle of the Barbicide solution at the time of issuance to the housing unit/cell. Inmates are to notify deputies if the spray bottle runs out of the Barbicide solution. Between each use, the inmates should spray the clippers, attachments and accessories with Barbicide solution and let them dry for at least ten minutes before each use. Inmates are prohibited from using the clippers, attachments and accessories without utilizing the Barbicide solution between uses.

(DN 55-19).[5] Plaintiff submits evidence of the May 2025 cleaning procedure seemingly to demonstrate Defendant's knowledge that its existing process of providing QS Plus hand sanitizer to inmates for use on the clippers was ineffective against MRSA transmission.

Plaintiff concludes that the MRSA infection on his neck was a result of inadequately-sterilized clippers because it was "in the exact location[ ] the communal hair clippers were used." (DN 55, PageID.595).

On the record before the Court, Plaintiff cannot satisfy either component of the deliberate indifference standard.

First, the parties do not dispute the presence of MRSA bacteria in close living quarters such as the DCDC, and thus a generalized risk of infection can be inferred. Significantly, however, Plaintiff does not allege an outbreak of MRSA in the jail or that infections were particularly prevalent during the time period at issue, *e.g.*, numerous inmates being treated for infections around the same time. The mere presence of MRSA at the DCDC is insufficient to show that Plaintiff was exposed to a substantial risk of serious harm. *See Bowers v. Livingston Cnty.*,

---

[5] For purposes of these motions, "Clippercide," "Barbicide," and germicide are presumed to be the same disinfectant product.

No. 08-CV-14134, 2009 WL 10679417, at *4 (E.D. Mich. Dec. 11, 2009), *aff'd*, 426 F. App'x 371 (6th Cir. 2011) (plaintiffs did not demonstrate that "MRSA bacteria was so widespread or virulent" to satisfy objective requirement that there was a "substantial, unreasonable, 'objectively intolerable' risk to inmates' health.") (quoting *Farmer*, 511 U.S. at 846)); *Oliver v. Bucks Cnty. Corr. Facility-Warden*, 181 F. App'x 287 (3d Cir. 2006) (holding that an inmate who proved he was "at *some* risk of catching MRSA" had not proved that he was subject to a substantial risk of serious harm; although there had been outbreaks in the past, the record was insufficient to establish a genuine issue of material fact as to whether there was a substantial risk of serious harm during the inmate's incarceration).

Second, Plaintiff does not show that he faced a substantial risk of serious harm from DCDC's clipper sanitization procedures. Plaintiff cannot make out a deliberate indifference claim "merely by demonstrating that MRSA poses a potential health threat and that defendants took, in [his] view, inadequate steps to address it." *Bowers*, 2009 WL 10679417, at *4. Assuming Plaintiff's evidence that QS Plus sanitizer is not intended for use on clippers is admissible, he offers no more than conjecture and speculation to connect its use to his infection. Thus, drawing all reasonable inferences in his favor, Plaintiff fails to raise a genuine issue of material fact as to the objective component of his Fourteenth Amendment claim. *See Moore v. Smith*, No. 1:13-CV-881, 2017 WL 1217786, at *6 (W.D. Mich. Mar. 3, 2017), *report and recommendation adopted*, 2017 WL 1159805 (W.D. Mich. Mar. 28, 2017) (plaintiff-inmate's claim that prison's use of "double diluted" bleach was of an insufficient concentration to disinfect laundry failed to satisfy objective component where plaintiff was "not an expert on preventing a communicable disease such as MRSA," and there was no record evidence to explain "the concentration of bleach necessary to disinfect laundry."); *Lee v. Birkett*, No. 09-10723, 2010 WL 1131485, at *7 (E.D.

Mich. Feb. 18, 2010), *report and recommendation adopted*, 2010 WL 1131486 (E.D. Mich. Mar. 22, 2010) (plaintiff failed to raise genuine dispute that policy of storing used razors together posed an unreasonable risk of harm where he failed to rebut the evidence submitted by defendants that storage box was sanitized and razors were capped and labeled with prisoner identification); *DeBlasio v. Johnson*, 128 F. Supp. 2d 315, 331 (E.D. Va. 2000) (plaintiffs' claim that defendants failed to sanitize barbering equipment between haircuts did not demonstrate an excessive risk to health or safety under Eighth Amendment; "[e]ven assuming that hepatitis has become a problem in the Virginia prisons . . . and that barbers have been failing to properly sanitize their equipment, plaintiffs have not articulated any excessive risk that is so shocking or barbarous as to violate the Constitution. Plaintiffs have not pointed to one instance of an inmate contracting hepatitis in the manner alleged nor have they cited any credible source indicating an excessive risk exists.").

      Plaintiff also cannot meet the subjective component of his claim which requires that DCDC officials knew of or should have been aware of a risk of MRSA infections resulting from the sanitizing procedures and that they recklessly disregarded it. Plaintiff's evidence of a subsequent remedial measure, even if admissible,[6] is insufficient to create a genuine dispute for trial. The May 2025 procedure of distributing Clippercide directly to inmates does not controvert the evidence of the existing sanitizing procedure by which jail staff applied Clippercide before and after distribution of the clippers. Nor does Plaintiff dispute that sanitizing procedures were utilized by Defendant. To the extent Plaintiff suggests that the QS Plus hand sanitizer provided to inmates was the exclusive method used in the jail to clean and sanitize clippers until May 22, 2025, this is belied by the evidence of record, including his own testimony, and cannot serve to create a genuine

---

[6] *See* Fed. R. Evid. 407 (evidence of subsequent remedial measures is admissible to prove culpable conduct), and *Smoot v. United Transp. Union*, 246 F.3d 633, 649 (6th Cir. 2001) ("[I]t is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment.") (alteration in original, internal quotation omitted).

14

dispute for trial. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). And even if Plaintiff could demonstrate that Defendant's sanitizing procedures were less than fully effective at preventing the spread of MRSA, this is insufficient to raise a genuine dispute as to whether Defendant recklessly disregarded the risk. *See Cameron v. Bouchard*, 815 F. App'x 978, 985-86 (6th Cir. 2020) (detainees could not show that jail officials recklessly disregarded serious risk of Covid-19; while measures taken may have been "imperfect" they were nonetheless "reasonable" and did not constitute deliberate indifference).

Because Plaintiff has not raised a triable issue of fact as to his Fourteenth Amendment conditions of confinement claim, his claim for municipal liability must necessarily fail. *See North*, 754 F. App'x at 389 (constitutional violation is a prerequisite for a § 1983 municipal liability claim). Had Plaintiff successfully raised a genuine dispute as to his underlying constitutional claim, he could not defeat Defendant's motion for summary judgment for an additional reason: Plaintiff's proof, if believed by a jury, would not be sufficient to establish an unconstitutional policy or custom because, even drawing the inference that he contracted MRSA from inadequately-sterilized clippers at the jail, evidence of his infection alone is insufficient to show a widespread policy of deliberate indifference. *See Perry v. Scott Cnty.*, No. 3:17-CV-234-TAV-HBG, 2020 WL 714116, at *8 (E.D. Tenn. Feb. 12, 2020) ("The isolated instance of [inmates'] alleged infection simply does not provide sufficient support for a reasonable jury to find Scott County Jail had a policy of deliberate indifference.") (citing *Miller v. Calhoun Cnty.*, 408 F.3d 803, 816 (6th Cir. 2005) (plaintiff presented no evidence of similar incidents having occurred at correctional facility for claim against county); and *North*, 754 F. App'x at 392 (while

15

medical recordkeeping system was "imperfect," plaintiff failed to demonstrate "systemic" county deficiencies that rise to the level of deliberate indifference) (internal quotation omitted)); *see also Gregory v. City of Louisville*, 444 F.3d 725, 763 (6th Cir. 2006) (concurring opinion) (plaintiff cannot rely solely on a single instance to prove the existence of an unconstitutional custom of municipality); *cf. Duvall v. Dallas Cnty., Tex.*, 631 F.3d 203 (5th Cir. 2011) (affirming verdict in favor of pretrial detainee where evidence of "serious outbreaks of MRSA in the jail," the county's awareness of the high incidence of infection, and its refusal to install hand washing and disinfecting stations or to use alcohol-based hand sanitizers was sufficient to show that: (a) detainee contracted a MRSA infection while in jail; (b) the county had an unconstitutional custom or policy in subjecting the jail's inmates to the pathogen; and (c) said policy caused the plaintiff's injury).

In the light most favorable to Plaintiff, the record could not lead a juror to draw the reasonable inference that Defendant created a custom or practice of unsanitary conditions resulting in Plaintiff's MRSA infection. As such, Plaintiff has neither raised a genuine dispute sufficient to survive Defendant's motion, nor has he demonstrated entitlement to summary judgment in his favor. Because Plaintiff's conditions of confinement/municipal liability claim lacks merit even under the more generous standard of review, his motion for summary judgment must be denied, and Defendant's motion for the same relief must be granted.[7]

## V.

For the reasons set forth above, and the Court being otherwise sufficiently advised,

---

[7] Because the Court finds that Defendant is entitled to summary judgment on the merits of Plaintiff's claim, the Court need not address its assertion of non-exhaustion.

**IT IS HEREBY ORDERED** that Defendant's motion for summary judgment (DN 53) is **GRANTED** and Plaintiff's motion for summary judgment (DN 55) is **DENIED**. The Court will enter a separate Judgment dismissing the action.

Date:    February 26, 2026

Joseph H. McKinley Jr., Senior Judge
United States District Court

cc:    Plaintiff, *pro se*
       Counsel of record
4414.015

17